# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 22-20013-CR-ALTMAN

**UNITED STATES OF AMERICA**,

*v.*

**ELIEZER MENAS ASPRILLA,**
Register No. 02671-506,
**JULIO CESAR RAMIREZ MOTA,**
Register No. 02665-506,
**HENNY MANUEL CASTRO RAMIREZ,**
Register No. 02669-506, *and*
**DANNY ALEXANDER CARRERA-BERNABE,**
Register No. 02661-506,

    *Defendants.*

_____/

### ORDER

After an hours-long evidentiary hearing—the first of two—we dismissed the drug-trafficking charges against our Defendants because the Government had failed to establish our subject-matter jurisdiction. *See* Order Dismissing the Indictment [ECF No. 50]. The problem at this first hearing was simple: The Government (as we observed) didn't produce a single witness who could say whether, before boarding the Defendants' boat, our Coast Guard officers had asked the Defendants *where* the boat was registered—a prerequisite to our jurisdiction under the Maritime Drug Law Enforcement Act (the "MDLEA"), 46 U.S.C. §§ 70501–70508.

The Government found itself in this awkward position because, as the defense pointed out in its Motion to Dismiss ("MTD") [ECF No. 27],[1] the boarding officers *never mentioned* this question in their initial reports. Having reviewed that MTD—and having recognized this glaring omission—the

---

[1] The Government responded to the MTD, *see* Government's Response in Opposition (the "MTD Response") [ECF No. 39], and the Defendants replied, *see* Defendants' Reply in Support (the "MTD Reply") [ECF No. 41].

Government asked one of those officers (a man named Law) to include this all-important jurisdictional question in a supplemental report. Before our first evidentiary hearing, then, Officer Law submitted a *second* statement—this time claiming that one of the Coast Guard officers *had* asked the jurisdictional question after all.

But, as the Government conceded at the first evidentiary hearing, Officer Law's supplemental report created an obvious conflict in the evidence—between the first report (composed on the day of interdiction), which made *no reference* to the crucial question, and the second (prepared months later), which now included this critical detail. Hoping to untangle this mess, we asked the Government to produce the boarding officers—the only people who *could* tell us whether our Defendants had been asked the MDLEA questions. But the Government had no Coast Guard officers to offer us—it apparently never having occurred to the Government that the documentary conflict would need to be resolved by a *witness*. And, since the Government wasn't sure *when* it would *ever* be in a position to produce a witness, *see* MTD Hearing Transcript (the "MTD Hr'g Tr.") at 156:18–22 ("The Court: But we have no idea how long that continuance would need to be. It's not tomorrow, right? [Government Counsel]: Absolutely, Judge. And I would have to investigate, and I would have to investigate as to Officer Law's availability and Officer Pimentel's availability."), we found that the Government had failed to establish our subject-matter jurisdiction and dismissed the Indictment.

Unhappy with this result, the Government promptly changed course: In a Motion for Reconsideration [ECF No. 52],[2] it disavowed its prior concession and took the untenable view that there never had been any conflict between the two Law statements. Having staked out this new position, the Government then claimed that we had "clearly erred" by agreeing with *both sides* that there *was* a conflict. This made very little sense—for reasons we'll explore soon enough. Nevertheless,

---

[2] The Motion for Reconsideration has been fully briefed. *See* Defendants' Response in Opposition (the "Response") [ECF No. 57]; Government's Reply in Support (the "Reply") [ECF No. 58].

in the interest of adjudicating this important question with the benefit of a full evidentiary record, we gave the Government *one final* opportunity to establish our MDLEA jurisdiction at a *second* evidentiary hearing—where, finally, we heard from two of the Coast Guard officers who interdicted our Defendants at sea.

Even at this second hearing, though, the Government presented—as we'll explain—inconclusive, inconsistent, and unpersuasive proof. Because the Government has thus failed to meet its burden of establishing our MDLEA jurisdiction, we now reaffirm the decision we made months ago and **DISMISS** the Indictment.

## THE LAW

The Defendants are charged with violating the MDLEA, which makes it unlawful for any person "on board a covered vessel . . . [to] knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). The MDLEA also criminalizes conspiracies onboard covered vessels. *Id.* § 70506(b). The MDLEA's prohibitions apply "even though the act is committed outside the territorial jurisdiction of the United States," *id.* § 70503(b), and "a covered vessel" includes any "vessel subject to the jurisdiction of the United States," *id.* § 70503(e)(1). As relevant here, the MDLEA defines a "vessel subject to the jurisdiction of the United States" as including, among other things, any "vessel without nationality." *Id.* § 70502(c)(1)(A).

A vessel is "without nationality" under the MDLEA—and thus "subject to the jurisdiction of the United States"—in any of three situations: (1) when the master makes a claim of registry, but the nation in question denies the claim, *id.* § 70502(d)(1)(A); (2) when "the master or individual in charge fails," in response to questioning by U.S. law enforcement, "to make a claim of nationality or registry for th[e] vessel," *id.* § 70502(d)(1)(B); or (3) when the country of claimed registry "does not affirmatively and unequivocally assert that the vessel is of its nationality," *id.* § 70502(d)(1)(C). The

second scenario—when "the master or individual in charge fails, *on request of an officer of the United States authorized to enforce applicable provisions of United States law*, to make a claim of nationality or registry for that vessel," *id.* § 70502(d)(1)(B) (emphasis added)—is the one at issue here.

The Eleventh Circuit has interpreted the phrase "on board a vessel subject to the jurisdiction of the United States" as reflecting a "congressionally imposed limit on courts' subject matter jurisdiction, akin to the amount-in-controversy requirement contained in 28 U.S.C. § 1332." *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008).[3] And, notably, our Circuit has "repeatedly confirmed that the MDLEA's jurisdictional requirement is *not* an element of an MDLEA offense that must be decided by a jury." *United States v. Nunez*, 858 F. App'x 320, 323 (11th Cir. 2021) (emphasis added). On the contrary, in the MDLEA, "Congress . . . plainly indicated that whether a vessel is subject to the jurisdiction of the United States . . . is solely an issue of subject matter jurisdiction that should be treated as *a preliminary question of law* for the court's determination." *United States v. Tinoco*, 304 F.3d 1088, 1105 (11th Cir. 2002) (emphasis added). And the Government bears the burden of establishing our MDLEA jurisdiction by showing that the vessel was "without nationality." *United States v. Guerro*, 789 F. App'x 742, 744–47 (11th Cir. 2019).

The Eleventh Circuit hasn't told us exactly what the Government's burden looks like in this context. *See id.* at 747 n.2 ("We leave open for another day whether the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence, because the government has failed to meet either standard of proof here." (cleaned up)); *Tinoco*, 304 F.3d at

---

[3] Federal courts regularly dismiss civil cases—*before* trial—when the amount-in-controversy requirement hasn't been satisfied. *See, e.g., Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 1255 (11th Cir. 2003) (affirming dismissal for lack of subject-matter jurisdiction where the plaintiff failed to establish the amount in controversy); *Torreyes v. Godiva Chocolatier, Inc.*, 424 F. Supp. 3d 1276 (S.D. Fla. 2019) (Altman, J.) (remanding a case for lack of subject-matter jurisdiction where the removing party failed to establish the amount in controversy). Given that the Government hasn't satisfied this "congressionally imposed limit on [our] subject matter jurisdiction," *De La Garza*, 516 F.3d at 1271, we likewise dismiss this case *before* trial.

1144 n.25 ("We further note that under our prior precedent, the government had to provide the jurisdictional requirement beyond a reasonable doubt. Now that § 1903(f) makes clear that the jurisdictional requirement is not an element of the substantive offense, the question arises of whether the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence. We need not resolve this issue, however, since we conclude that the government has met the higher standard of proof in this case."). Since the Government in our case hasn't met the *lower* bar of establishing our jurisdiction by a preponderance of the evidence, we (like the Circuit) "leave open for another day whether the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence[.]" *Guerro*, 789 F. App'x at 747 n.2 (cleaned up).[4]

In any event, "[w]ritten into the [MDLEA] are strict requirements for establishing jurisdiction over the vessels and people the government seeks to prosecute." *Id.* at 744; *see also* 46 U.S.C. § 70502(d)(1)(A)–(C). And that's why the Eleventh Circuit has said that, "[w]hen the government fails to follow these requirements, the MDLEA provides courts no jurisdiction over prosecutions under its terms." *Guerro*, 789 F. App'x at 744. But there's a crucial difference between the requirements of § 70502(d)(1)(B)—the subsection at issue here—and the other two provisions of § 70502(d)(1). With respect to those other two subsections, the MDLEA is clear: "The response of a foreign nation to a claim of registry under paragraph (1)(A) or (C) may be made by radio, telephone, or similar oral or electronic means, and is *proved conclusively* by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. § 70502(d)(2) (emphasis added). But § (1)(B) doesn't include this "conclusive

---

[4] A preponderance of the evidence means "evidence which is more convincing than the evidence offered in opposition to it." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (cleaned up). "Or phrased in a slightly different fashion, it is proof that persuades the trier of fact that a proposition 'is more likely true than not true.'" *United States v. Watkins*, 10 F.4th 1179, 1185 (11th Cir. 2021) (quoting *United States v. Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000)).

proof" language—which we take to mean that, in cases under § (1)(B), the Government must *prove* jurisdiction. *Cf. Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quoting *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015))); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Savage Servs. Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) (refusing to read into the Oil Pollution Act a waiver of sovereign immunity because "Congress . . . knows how to waive sovereign immunity when it wants to").

## THE FACTS

On December 24, 2021, a Coast Guard Maritime Patrol Aircraft spotted a go-fast vessel[5] ("GFV") in the open seas about 150 miles north of Santo Domingo, Dominican Republic. *See* MTD Response at 3; *see also* MTD at 1. The Coast Guard Cutter *Winslow Griesser* launched its small boat with a boarding team to investigate, and the boarding team found our four Defendants on the GFV. *See* MTD Response at 3; *see also* MTD at 1. Believing that the GFV was stateless, the Coast Guard team treated the vessel as one without nationality and boarded it. *See* MTD Response at 3. The Coast Guard ultimately recovered sixteen bales of suspected cocaine from the jettison field around the GFV—and an additional package from the vessel itself. *Ibid.* Two field tests then confirmed that all seventeen bales—which weighed about 700 kilograms—were filled with cocaine. *Ibid.*

Over the next eleven days, the Coast Guard transported our Defendants to the Southern

---

[5] "A working definition of a go-fast is a power boat which primarily employs speed to evade capture." H.I. Sutton, *3 Types of Go-Fast Narco Boats the Coast Guard Faces*, FORBES, available at https://www.forbes.com/sites/hisutton/2020/08/21/3-types-of-high-speed-smuggling-boats-facing-the-coast-guard (last visited May 15, 2023).

District of Florida—a journey that involved several transfers and a few pit stops, including one in Puerto Rico. *Ibid.*; *see also* MTD at 1–2. On January 4, 2022, the Defendants arrived in our District, and the Government charged them by criminal complaint with conspiring to possess with the intent to distribute five kilograms or more of cocaine while onboard a vessel subject to the jurisdiction of the United States. *See* MTD Response at 4; *see also* MTD at 2.

Two weeks later, on January 20, 2022, a federal grand jury returned a two-count indictment, charging the Defendants with two crimes under the MDLEA: conspiring to possess (Count 1)—and possessing (Count 2)—with the intent to distribute 500 kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States. *See generally* Indictment. The Defendants then moved to dismiss the Indictment, which kicked off the tortuous sequence of events that brings us here.

DISCUSSION

Before we can assess the merits of the MTD, we'll need to summarize our procedural history—stopping along the way to synthesize, against the backdrop of that history, the most significant pieces of evidence.

## I.    Discovery and the MTD

During discovery, the Government produced two Coast Guard reports. *See* First Law Statement [ECF No. 54-3]; First Pimentel Statement [ECF No. 54-4]. The First Law Statement—signed on December 26, 2021 (two days after the interdiction)—says this:

> While on a routine patrol in the Caribbean Ocean onboard CGC Winslow Griesser on 24 December, 2021 we received a report of a Target of Interest (TOI) a Go Fast style vessel in position 15*45.88 N 070*59.37 W from CG 2307. At approximately 1744 local time we got underway on CG 26316 to intercept the TOI. The weather at the time of the boarding was winds 074 degrees true at 14 knots, swells were out of 160 degrees true at 02 feet, and visibility was 08 nautical miles. The bot [sic] crew consisted of myself as the pursuit coxswain, MK2 David Patnaude as the Boarding Officer, GM2 Justin Miskimon as BTM, and MK1 Yocar Pimentel as the translator. At 1736 District 7 granted an SNO for Step II, IV, and ROV boarding.

7

At approximately 1800 we visually spotted the TOI and energized our blue light and siren and hailed to the vessel to stop. The vessel was approximately 20 feet in length, grey in color with a blue tarp on top, and two Yamaha 50 HP outboards and showed no signs of nationality. The people on board the vessel were hiding underneath the tarp and MK1 Pimentel instructed them to come out and put their hand [sic] in the air. The people on the vessel were compliant and I identified a Hispanic male with a grey cap and facial hair that was driving the boat. I then had the Boarding Officer and BTM go onboard the vessel to gain positive control. The Boarding team completed a basic initial safety sweep then frisked the people on board to make sure they did not have any weapons. Onboard the vessel I noticed fuel drums and a large white package on the back of the boat that appeared to be contraband. We then transferred the subjects on to our boat. Then I noticed a large debris field of approximately 20 packages of contraband floating near the TOI. I then proceeded to pick up as many of the packages as I could before it got dark and lost sight of any more. We then transferred the subjects and contraband to the CGC Winslow Griesser.

First Law Statement at 1.

The First Pimentel Statement (also signed two days after the interdiction)[6] tells precisely the same story: spotting the Defendants; pursuing their vessel; boarding the GFV; ordering the Defendants to put their "hands up"; and collecting the drugs. Here's how Officer Pimentel remembered the interdiction:

On December 24th, 2021 at [a]pproximately 1744 the OTH was launched with myself, Translator Petty Officer First Class Yocar E. Pimentel, a Pursuit Coxswain BMC Law (PCOX), Pursuit Mission Commander Boarding Officer Patnaude (PMC/BO), and Petty Officer Miskimon (Gunner and Boarding Team Member) to conduct a right of visit boarding on a grey panga style vessel approximately 20 FT in length. When I made visual contact with the vessel it was off our starboard bow, we turned on the LE blue lights and I immediately turned on my flashlight towards the panga/raft. Vessel stopped at approximate position, 15-42.7N, 071-04.0 W. We also turned on the siren and I started giving them commands in Spanish telling them to put their hands up and keep them that way until told to do so. They complied, vessel heaved too [sic] and stopped. As soon as we pulled up on scene I saw 4 persons on board, 1 on the helm and the 3 other [sic] scattered around the bow and under a blue tarp. The person on the helm put their hands in the air after I was giving them instructions and the other 3 hid under a tarp that was covering the fuel and the suspected narcotics on board. I gave the suspected drug smugglers task directions to come out with their hands up and do not move their hands. Once they came out from the tarp I was ensuring that they did not move until the Boarding Team took control

---

[6] Officer Pimentel testified that he wrote his First Statement on December 26, 2021. *See* Nov. 29, 2022, Hearing Transcript ("Second Hr'g Tr.") [ECF No. 80] at 33:12–14 ("Q: To be clear, the date – waiting for it to focus – the date that you generated this document was? A: December 26, 2021.").

of the situation onboard the raft/panga. Officer Patnaude (Boarding Officer) and Officer Miskimon (Boarding Team Member) jumped over onto the suspected smuggling vessel and took control of the situation by frisking all the 4 crew members of the vessel to check for weapons or means of escape.

Once the Commanding Officer gave us permission we transferred the crew members over to the OTH. After the suspected drug smugglers were placed onto the OTH, myself and Officer Steven Law (Coxswain) picked up 10 bales of suspected cocaine from the water that was jettison[ed] overboard by the suspected smugglers. We then transferred the suspected smugglers to the Cutter and returned to the smuggling vessel to retrieve ION SCANS, 1 package of suspected narcotics and the 2 Boarding Team Members we left conducting the boarding, Officer Patnaude and Officer Miskimon. We gave ION scans to cutter and then notched with contraband onboard the OTH. We offloaded the contraband and I proceeded to the inside of the cutter while Officers conducted NIK Test to positively identify the narcotics[.]

First Pimentel Statement at 1–2 (errors in original).

Notably absent from either statement, though, is *any* mention of the jurisdictional question that's so important to our case. And that omission is critical because the MDLEA *explicitly* requires the Government to *prove* that the Defendants were onboard a vessel that was "without nationality"— and therefore "subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A). As we've said, the Government can make this showing by demonstrating that "the master or individual in charge fails, *on request of an officer of the United States* authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel[.]" *Id.* § 70502(d)(1)(B) (emphasis added).

Because the Law and Pimentel Statements *never* mentioned any such "request" by "an officer of the United States," the Defendants moved (on March 29, 2022) to dismiss the charges, citing (among other things) the Government's failure to establish our subject-matter jurisdiction. *See generally* MTD at 14–16; *see also id.* at 16 ("Because the government has failed to establish that the Coast Guard asked the necessary questions to identify the master *or* individual in charge, or to establish whether said individual wished to make a claim or [sic] *or* registry, it has failed to demonstrate statutory jurisdiction and the indictment must be dismissed.").

Two weeks later, the Government (prompted by the MTD) produced the Second Law Statement [ECF No. 51-10], which now included the *crucial detail* the First Law and Pimentel Statements had omitted all those months before.[7] This Second Law Statement is an interesting document. Its first paragraph (which recounts Law's observations of the date, time, and place of interdiction) is virtually identical to the opening paragraph of the First Law Statement. But the second paragraph is very different. In that second paragraph, Law—writing four months *after* the interdiction—now claims, for the first time, that "the translator MK1 Pimentel asked all the subjects onboard who was the master of the vessel and all of them said that they were not the master." Second Law Statement at 1. Because it's so important to our case, we'll recreate this second paragraph in full:

> At approximately 1800 we visually spotted the TOI and energized our blue light and siren and hailed to the vessel to stop. The vessel was approximately 20 feet in length, grey in color with a blue tarp on top, and Yamaha 50 HP outboards and showed no signs of nationality. After the boarding team gained positive control of the vessel we completed a basic initial safety sweep and identified four subjects onboard. The people on the vessel were compliant and I identified a Hispanic male with a grey cap and facial hair later identified as Henny Manuel Castro Ramirez as the driver of the boat. Then the translator MK1 Pimentel asked all the subjects onboard who was the master of the vessel and all of them said that they were not the master. Then MK1 Pimentel asked what the nationality of the vessel was and no one claimed any nationality for the vessel. MK1 Pimentel then asked their individual nationality and three of the members claimed Dominican Republic and one claimed Columbia [sic].

*Ibid.*

How did this happen? Did our Coast Guard officer suddenly—months after the fact, and on the eve of the Government's filing deadline—recover a previously-lost memory about this event from the distant past? Or did a Government lawyer, recognizing the urgency of the omission, contact him—perhaps through several of his superiors—to ask (or suggest) that he issue a *new* report, this time with

---

[7] The Second Law Statement is dated April 12, 2022. *See* Second Law Statement at 1. That's four months after the interdiction, two weeks after the Defendants filed their MTD, and *the very same day* on which the Government moved for an extension of time to respond to the MTD. *See generally* Docket.

the crucial detail included? Well, we needn't speculate because the Government has admitted that, "in the process of responding to the motion to dismiss, the government did reach out to the U.S. Coast Guard in an attempt to obtain the information necessary to address this question relating to statutory jurisdiction and relating to the questions that were asked of the defendants when they were apprehended. It was in response to that request and the inquiry that the Coast Guard provided the information that was submitted in response – in the response to the motion to dismiss." MTD Hr'g Tr. at 118:13–21.[8] Much more on this later.

## II.     The First Evidentiary Hearing and our First Order of Dismissal

On May 31, 2022, we held an evidentiary hearing on the Defendants' MTD. We had originally scheduled that hearing on March 30, 2022, for April 14, 2022. *See* Paperless Notice of Hearing [ECF No. 29]. And we then moved the hearing four separate times to accommodate the parties' various scheduling conflicts. *See* Paperless Notices Resetting Hearing [ECF Nos. 33, 37, 43, 46]. At this first hearing, the Government called Coast Guard Lieutenant Paul Puddington, who testified about the Defendants' interdiction, their detention at sea, and their eleven-day journey to the Southern District of Florida. *See generally* MTD Hr'g Tr. at 11:23–41:7. On cross-examination, the defense lawyers focused mainly on their Rule 5 arguments and asked *no questions* about the issue we're addressing today. *See id.* at 43:22–81:4.

The Government then called DEA Special Agent Alec Sanchez, who took us through what happened when the Defendants arrived in the Southern District of Florida.[9] *See id.* at 84:23–98:10. As with Lieutenant Puddington, defense counsel cross-examined Special Agent Sanchez *only* on those Rule 5 issues—*never* touching the question we're confronting now. *See id.* at 102:7–112:11.

---

[8] Nor could Officer Law have recalled the substance of the boarding officers' conversation with the Defendants because—as we're about to learn—Officer Law speaks *no* Spanish, and the Defendants speak *no* English.
[9] Basically, they were processed and interviewed.

When the Government rested, however, defense counsel noted (rightly) that the Government hadn't shown that "the master or individual in charge fail[ed], on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for the vessel[.]" 46 U.S.C. § 70502(d)(1)(B); *see also* MTD Hr'g Tr. at 113:7–9, 16–20 ("[Defense Counsel]: But I did want to flag for Your Honor that there is a separate statutory jurisdiction issue that needs to be determined as well. . . . [t]hat the Coast Guard did not ask the necessary questions to identify a master or individual in charge, or to ask whether anybody, the master or the individual in charge, wanted to make a claim of nationality or registry for the vessel."). Indeed, as defense counsel pointed out, "the government attached [the Second Law Statement] to their response. . . . [and] that statement was prepared after the motion was filed and is different than certain statements in discovery." *Id.* at 113:20–25. Of those other statements, defense counsel continued, "they're submitted for the proposition that they also lack any information about questions regarding the nationality or registry of the vessel." *Id.* at 115:18–20; *see also* MTD Reply at 9 ("[The Second Law Statement] states that the translator asked all subjects who the master was, and no one identified themselves as the master. But the translator's own statement, which provides details about what the translator did and communicated to Mr. Menas A[s]prilla and his codefendants, makes no mention of these questions or responses.").

We admitted into evidence *both* the First Law Statement *and* a composite exhibit [ECF No. 54-4], which included the First Pimentel Statement, a statement from Officer Patnaude, and a statement from another member of the boarding team, Officer Justin Miskimon. *See* MTD Hr'g Tr. at 114:17–116:6. As we've hinted, *none* of those four statements included *any reference* to the MDLEA jurisdictional question. The whole of the jurisdictional evidence now having been proffered *by the defense*, the Government conceded that it had failed to shoulder its burden under the MDLEA—this, despite having seen the jurisdictional issue in the Defendants' MTD. *See id.* at 116:19–23 ("The Court

[speaking to the prosecutor]: . . . [A]ll we have in evidence now, I'll just tell you, is what [defense counsel] just put in, which is not enough for you, given your burden to prove statutory jurisdiction. You agree with that, right? [Government Counsel]: I do.").

Trying to salvage the case, the Government asked for permission to reopen its case-in-chief, *see id.* at 153:11–13 ("[Government Counsel]: I was referring to a witness, Judge. I have no witness, Judge. I would be putting in the document, yes, sir.")—a request we granted over the Defendants' objections, *see id.* at 154:23–154:12 ("[Defense Counsel]: Yes, Your Honor. I would object to – and I recognize this is mostly for preservation purposes, but object to the introduction on confrontation clause and hearsay grounds. I understand the Eleventh Circuit has ruled that Your Honor can consider evidence that would otherwise violate the confrontation clause, but we would make that objection for the record. [All defense counsel then join in the objection.] . . . The Court: All right. I'll overrule that objection, and the document will be admitted over that objection."). Now back in the driver's seat, the Government introduced the Second Law Statement—again, over defense objections. *See id.* at 154:23–155:2 ("[Defense Counsel]: And I'd – just for objection preservation, for objection preservation, Your Honor, I just add that the statement that the government will be relying on is double hearsay within this document. And I'm prepared to add to that."). But, as defense counsel noted, this Second Law Statement simply created a *conflict* in the record evidence. *Id.* at 113:20–25 ("[Defense Counsel]: [The Second Law Statement] was prepared after the motion was filed and is different than certain statements in discovery."). And, to its credit, the Government agreed with this characterization:

> The Court: But we have two documents now. Let's say that [the Second Law Statement] comes into evidence. . . . So now we got two documents; they contradict each other, correct?"
>
> [Government Counsel]: They certainly do.

*Id.* at 119:18–22. The Government then conceded that this conflict could only be resolved by a witness—presumably Officer Law, but possibly someone else:

> The Court: But you agree that his [Officer Law's] testimony is necessary to establish the jurisdiction?
>
> [Government Counsel]: I do.

*Id.* at 121:8–10.

Unfortunately, the Government had no such witness. Indeed, although the hearing had been set for two months, the Government hadn't brought *a single officer* who could attest to anything that happened during the interdiction. Remember that the only Coast Guard officer the Government *had* produced—Officer Puddington—wasn't actually a witness to anything. He, instead, did little more than review, from afar, the records of the officers who *were* there. *See id.* at 12:18–24 ("[Government Counsel]: Were you the enforcement duty officer on duty on December 24th of 2021 and during the weeks following, sir? A: Yes, ma'am. Q: Have you reviewed the U.S. Coast Guard records relating to the detention of the defendants in this particular case, the case of Mr. Menas Asprilla and his codefendants? A: I have."). Nor—despite some prodding from us—could the Government provide any assurances that it would have a witness anytime soon:

> The Court: Let me ask you this. Mr. Law is a necessary witness here. Perhaps also the person in Spanish – is it Patnaude? Or who's the person –
>
> . . . .
>
> The Court: Pimentel, who allegedly asked the defendants this question, correct?
>
> [Government Counsel]: Yes, that's right.
>
> The Court: We have no evidence other than this document, which is double hearsay, and probably Mr. Petruzzi may be right, was said in a language that Mr. Law does not speak, so far as we know.
>
> [Government Counsel]: Which would mean that if the Court were to entertain the government's request for a continuance, the government would be seeking – because I did ask the Court that earlier.

> The Court: But we have no idea how long that continuance would need to be. It's not tomorrow, right?
>
> [Government Counsel]: Absolutely, Judge. And I would have to investigate, and I would have to investigate as to Officer Law's availability and Officer Pimentel's availability.

*Id.* at 156:2–22.

Since the Government had failed to meet its burden of establishing our MDLEA jurisdiction, we granted the MTD and dismissed the Indictment. *See id.* at 159:9–10 ("It was the government's burden to prove jurisdiction. They failed to do so, and so I grant the motion."). One day later, we followed up our oral pronouncement with a written decision, in which we observed:

> It's true that, where a defendant fails to challenge the Court's MDLEA jurisdiction, the Eleventh Circuit has allowed the Government to establish that jurisdiction at any time—even *after* a plea. *See United States v. Iguaran*, 821 F.3d 1335, 1338 (11th Cir. 2016). But our Defendants *have* challenged the Court's jurisdiction, and that challenge triggered the Government's obligation to "*preliminarily* show that the defendant was 'on board a vessel subject to the jurisdiction of the United States.'" *De La Garza*, 516 F.3d at 1271–72 (emphasis added). Recognizing the Government's *preliminary* obligation to establish MDLEA jurisdiction—and given our own *preliminary* obligation to resolve this jurisdictional question—we set (way back in March of 2022) an evidentiary hearing. That hearing took place yesterday, on May 31, 2022—and lasted some five hours. But, at that hearing, the Government failed to produce *even a single witness* who could establish that the Defendants were asked to "make a claim of nationality or registry for th[eir] vessel"—an oversight the Government's lawyer readily conceded. That's really the end of that.

Order Dismissing the Indictment at 2–3.

About two hours after we entered our Order, the Government moved for reconsideration, *see* Motion for Reconsideration, insisting (contra *both* logic *and* what Government Counsel had said at the hearing) that "the Coast Guard statement [the Second Law Statement] relied upon to establish statutory jurisdiction was legally sufficient and did not contradict earlier submitted statements which did not address the subject of the defendants' questioning regarding nationality claims for their vessel." *Id.* at 1. This was absurd, of course. What else do we call it when there's an inconsistency between a

contemporaneous document (which omits a crucial detail) and a more-recent statement that (*voilà*) includes that missing detail? More on this later.

Still, hoping to resolve the issue on a complete record, we ordered "a temporary stay on the Defendants' release pending [our] resolution of the Motion [for Reconsideration]" and set a briefing schedule. Paperless Order Setting Briefing Schedule [ECF No. 53]. Once that briefing was in, we directed the Government to "file on the docket two affidavits, one each from BMC Steven Law and MK1 Yocar Pimentel, detailing the testimony each would offer at a hearing on the question of statutory jurisdiction." Paperless Order Requiring Affidavits [ECF No. 61]. When the Government complied with our order (kind of), *see* Notice of Filing [ECF No. 62],[10] we granted the Motion for Reconsideration and set a second evidentiary hearing—this one limited *only* to the issue of MDLEA jurisdiction, *see* Paperless Order Granting Reconsideration and Setting Hearing [ECF No. 64].

Understandably peeved by our decision to give the Government *yet another* bite at the apple, the Defendants filed their own Joint Motion for Reconsideration [ECF No. 65], in which they advanced three arguments: (1) that "the government entirely failed to establish any ground for reconsideration"; (2) that there was "no basis upon which to [reopen the hearing] to permit the government to present testimony and evidence that was plainly available to it prior to the evidentiary hearing"; and (3) that "the government failed to comply with the Court's October 8, 2022, Paperless Order requiring that it submit *affidavits* from Law and Pimentel[.]" Joint Motion for Reconsideration

---

[10] We say "kind of" because the Government didn't file sworn affidavits; it submitted unsworn statements. *See* Notice of Filing [ECF No. 62]. The Defendants made much of this discrepancy in their own motion for reconsideration, in which they asked us to reconsider our decision to set a second hearing because, among other things, "the government failed to comply with the Court's October 8, 2022, Paperless Order requiring that it submit *affidavits* from Law and Pimentel." Defendants' Joint Motion for Reconsideration [ECF No. 65] at 3. We rejected this hyper-technical reading of our prior order and denied the Defendants' reconsideration request. *See* Paperless Order Denying the Defendants' Motion for Reconsideration [ECF No. 85] ("[T]he Government filed signed statements from Officers Patnaude and Pimentel, in which the officers attested that the statements were true and accurate to the best of their recollections. Our Paperless Order required nothing more.").

at 2–3. While acknowledging the Defendants' legitimate grievances, we nevertheless denied their motion in a paperless order, reasoning: "[W]e haven't yet reversed course on our decision to dismiss the indictment; we've simply allowed the Government to adduce some additional jurisdictional evidence so that, in deciding once and for all whether the indictment should be dismissed, we might have the benefit of a full evidentiary record." Paperless Order Denying Reconsideration [ECF No. 85].

We'll add one more detail before we dive into the second evidentiary hearing. As we've indicated, in response to our Paperless Order Requiring Affidavits, the Government produced the Second Pimentel Statement [ECF No. 62-2]. Like the Second Law Statement, this Second Pimentel Statement was word-for-word identical to the first—except that it added the following crucial paragraph:

> I asked everyone as a group, "who is the master" in Spanish and no one onboard wanted to make a claim as the master of the vessel. At least 2 persons on board simply said that nobody was the master. Additionally, no one on board the panga made a claim of nationality for the vessel. They were asked as a group first when we pulled alongside. The person that I observed operating the vessel said that they were originally from Dominican Republic but did not make a claim of nationality when asked specifically if he wanted to. The question was asked "would anyone like to make a claim of nationality for the vessel." This was asked in Spanish "Alguien en el bote desea hacer un reclamo de nacionalidad." The persons on board claimed they did not speak English. I also asked where they from are [sic], in Spanish this is "De donde son ustedes." To this question the person operating the vessel said that they were from Dominican Republic.

Second Pimentel Statement at 1. The electronic signature block reveals that Officer Pimentel signed this Second Statement on October 13, 2022—almost *ten months after* our Defendants' interdiction.

We found this Second Pimentel Statement curious from the beginning. For one thing, Officer Pimentel's Spanish question—"Alguien en el bote desea hacer un reclamo de nacionalidad?"—doesn't mean what he says it means (*i.e.*, "would anyone like to make a claim of nationality *for the vessel*[?]"). Instead, even if we accept that Officer Pimentel was able to recreate from memory—ten months after the fact—*precisely* what he yelled at these Defendants in the aftermath of a high-speed chase on choppy

seas,[11] his question ("Alguien en el bote desea hacer un reclamo de nacionalidad?") translates as: "Does anyone on the boat wish to make a claim of nationality?" Officer Pimentel, in other words, never asked the Defendants whether they wished to make a claim of nationality *for the vessel*—at least not in Spanish.[12] And that's a problem for the Government because, a few seconds later, the Defendants (according to Pimentel) claimed to hail from "the Dominican Republic"—a perfectly natural answer to the question *as it was posed to them in Spanish*. Of course, this discrepancy between what Officer Pimentel asked in Spanish and what he claimed to ask in English is the whole ballgame because, as we've explained, a vessel is "without nationality" and therefore "subject to the jurisdiction of the United States," 46 U.S.C. § 70502(c)(1)(A), *only if* "the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for *that vessel*," *id.* § 70502(d)(1)(B) (emphasis added). Since the

---

[11] As we'll explain in more detail below, we think Officer Pimentel's memory of this event was clouded to a significant degree by four factors: the passage of many months; a very busy interdiction period; this event's proximity to the next day's interdiction; and the extremely suggestive email he received from an inquiring Coast Guard lieutenant.

[12] We take judicial notice of this *correct* translation of Pimentel's statement. *See* FED. R. EVID. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). If the Government objects to our decision to take judicial notice, *see* FED. R. EVID. 201(e), it may file a motion noting that objection within **seven days** of this Order. For whatever it's worth, we don't think the accuracy of our translation can reasonably be questioned. For one thing, the Undersigned was born in Venezuela and is a native Spanish speaker. For another, the sentence in question is so simple—and Pimentel's translation is so egregiously wrong—that even a first- or second-year Spanish speaker would know that Pimentel didn't ask the Defendants (in Spanish) for *the vessel's* registry.

In any event, our translation really isn't the Government's biggest problem here. As we'll explain (*q.v.* our discussion at pp. 20–21), when we set a second evidentiary hearing on the MTD and ordered the Government to establish our jurisdiction with competent proof, the Government brought us the *testimony* of Officer Pimentel. And, during *that* testimony, Pimentel said that he asked the Defendants a different question: "[i]f anyone wants to make a claim of nationality for themselves <u>or</u> for the vessel." Second Hr'g Tr. at 29:1–3 (emphasis added). One of the Defendants answered this disjunctive question by claiming that "they were Dominican." *Id.* at 29:6. And that's true: Some of the Defendants *are* Dominican. Since the Defendants answered the officer's question truthfully, the Government hasn't met its burden of establishing our MDLEA jurisdiction. Even putting this translation issue aside, in other words, we would have dismissed this Indictment.

Defendants weren't asked (in Spanish) to claim nationality *for the vessel*, the Government couldn't prove—at least not through the Second Pimentel Statement—that they were traveling on a stateless vessel.[13] Because the Second Pimentel Statement thus failed to establish our MDLEA jurisdiction, we proceeded to a second evidentiary hearing. *See* Paperless Order Granting Reconsideration and Setting Hearing.[14]

### III.   The Second Evidentiary Hearing

At this second hearing, the Government did what it ought to have done the first time around: It brought witnesses. Specifically, Officers Pimentel and Patnaude[15] testified at length about the interdiction—and, in particular, about the conversations Pimentel had with the Defendants just before the GFV was boarded. *See generally* Nov. 29, 2022, Hearing Transcript ("Second Hr'g Tr.") [ECF No. 80]. Since Officer Pimentel was the only Spanish-speaking Coast Guard officer—and because he was the only member of the boarding team who spoke with the Defendants directly—the Government called him first. After Officer Pimentel summarized his credentials, his Coast Guard experience, and

---

[13] There's a second problem with this aspect of the Second Pimentel Statement: If (as Pimentel's Spanish question indicates) the Defendants were only asked to claim *their own* nationality—and if (again, as Pimentel recounts) the Defendants truthfully answered that they were from the Dominican Republic—then the Defendants wouldn't have "fail[ed]" to answer any request by an "officer of the United States[.]" 46 U.S.C. § 70502(d)(1)(B).

[14] Officer Pimentel (notably) never suggested that any Defendant claimed to come from Colombia. Here, of course, he contradicted Officer Law, who had written that "three of the members claimed [to come from the] Dominican Republic and one [of the men on the vessel] claimed Columbia [sic]." Second Law Statement at 1.

[15] Petty Officer Patnaude was the Pursuit Mission Commander Boarding Officer at the interdiction. *See* First Pimentel Statement at 1. One might be surprised to learn that Officer Law didn't testify at this hearing—especially since, in its briefing, the Government's jurisdictional arguments relied so heavily on *his* statements. Nevertheless, we agree with the Government that Officer Law wouldn't have added much. As Officer Pimentel noted in his Second Statement, the Defendants "claimed they did not speak English," Second Pimentel Statement at 1, and Officer Law *only* speaks English. Indeed, Pimentel testified that he (Pimentel) was the *only* fluent Spanish-speaker on the boarding team—and that he was thus the *only* officer who spoke with the Defendants directly. *See* Second Hr'g Tr. at 45:24–46:4 ("Q: And you were the only member of the boarding team that was fluent in Spanish, right? A: In that particular case, yes. Q: Okay. And so you were the only person communicating directly with the detainees. A: Yes.").

his employment history, the Government asked him about the specific questions he'd posed to the

Defendants just before boarding. Here's how that portion of the direct went down:

> [Government Counsel]: Tell the judge whether [Patnaude] was telling you what exactly he wanted you to say or not.
>
> A: He told me to ask, "Who is the master?" We knew at this point, in the area that we're working that, uhm, all the cases that I had since I been there, and everyone is Spanish-speaking; I never had anyone speak English. So we basically – he told me to ask, "Who is the master," and I went ahead and asked that in Spanish.
>
> Q: When you did that, the individuals are on board, they've got their hands in the air, did you get any response?
>
> A: No one wanted to make a claim of being the master of the vessel.
>
> Q: Did you ask the whole group of individuals at the same time or did you ask them one by one?
>
> A: It was asked as a group. In the situation that we were on, we just pulled alongside them and basically asked as a group, "Who is the master," if anyone wants to make a claim as the master.
>
> Q: What was the next question that you asked?
>
> A: If anyone wants to make a claim of nationality *for themselves or for the vessel*.
>
> Q: Did you get an answer from any of the individuals on board to that question?
>
> A: No. *Just someone said that they were Dominican*, but they did not make a claim of nationality for themselves or the vessel.

*Id.* at 28:8–29:8 (emphases added).

We'll begin by re-emphasizing the obvious point we made a few pages back: Even if we accept

everything Officer Pimentel said as true, the Government hasn't shown that the Defendants "failed"

to answer a request by an "officer of the United States[.]" 46 U.S.C. § 70502(d)(1)(B) (cleaned up). On

the contrary, as Officer Pimentel explained, he asked the Defendants whether they'd like to "make a

claim of nationality *for themselves or for the vessel*," and one of the Defendants truthfully answered that

"*they* were Dominican." Two things here. *One*, Officer Pimentel asked his question in the disjunctive—

which means that the Defendants wouldn't have "failed" to respond if they had chosen to answer *only*

*one part* of that disjunctive. So, for example, in response to the prompt "please give me your birthdate <u>or</u> your social security number," it's perfectly appropriate to say: "May 1, 1992." That's exactly what the Defendants did here.

*Two*, the Defendants would've answered Officer Pimentel's question fully *even if* it hadn't been posed in the disjunctive. Recall that, according to Officer Pimentel, the answering Defendant said that "*they* were Dominican." Given Officer Pimentel's use of the plural form ("they"), we think it natural to infer that our interlocutor Defendant answered this question with the plural form ("we"). So, even if Officer Pimentel had asked something like "Would anyone like to make a claim of nationality for themselves <u>and</u> for the vessel," the speaking Defendant's use of the plural "*we* are Dominican" would have naturally suggested that *both* the Defendants *and* their vessel were Dominican. Of course, it's certainly *possible* that the answering Defendant meant here to respond *only to one part of* Officer Pimentel's question—and to specify only that the *humans* Officer Pimentel was asking about, but *not* their vessel, were Dominican. But what evidence do we have of that? And, since it's the Government's burden to *prove* that the Defendants "failed" to answer Officer Pimentel's question, we won't assume—given these two possible constructions—that the Defendants were answering the question in a (frankly awkward) way that just happens to suit the Government.

From there, things just got worse for the Government. After introducing the First and Second Pimentel Statements into evidence, *see* Second Hr'g Tr. at 33:3–34:24, Officer Pimentel admitted that he wrote his Second Statement "in response to a request that [he] received in October of this year," *id.* at 34:21–24 ("Q: And this is, in fact, the statement that you generated in response to a request that you received in October of this year, is that right? A: Yes."). Although the Government left this subject alone, the defense—as we'll soon see—was not so charitable.

The Government then quickly moved on to something the parties called "the Alpha Report"—which Officer Pimentel described this way: "[W]hen we're doing these type[s] of cases, we

ask the questions, and we're passing the information that we receive from the persons on board through a secure frequency to the Coast Guard cutter, to the bigger cutter. They have what is called an 'alpha report,' and they start filling that out as we ask the questions." *Id.* at 29:22–30:2. When the prosecutor asked "When was it that [you] got an opportunity to review the alpha report?" Officer Pimentel replied: "I reviewed this for the first time possibly two weeks ago." *Id.* at 35:14–16. And that was it for the direct.

On cross-examination, Officer Pimentel agreed with defense counsel about "how important it is to kind of document your work," including "things that you see during an interdiction," "things that you hear," "things that you do," and "things that other people do." *Id.* at 40:2–21. Officer Pimentel then confirmed that his written "statements are really important," which is why he "tr[ies] to write those statements as soon as [he] possibly can under the circumstances"—because "your memory is freshest closer in time to when the interdiction happened." *Id.* at 40:25–41:7.[16] And (again) Officer Pimentel's account was crucial *both* because he was "the only member of the boarding team that was fluent in Spanish," *id.* at 45:24–25, *and* because he was "the only person communicating directly with the detainees," *id.* at 46:2–3. Officer Pimentel explained that he "wrote a statement . . . two days after[17] the interdiction," *id.* at 43:12–14, describing "the day that the interdiction happened, the time of day[,] . . . [t]he coordinates, geographic coordinates[,] . . . [w]ho was there[,] . . . the vessel,

---

[16] The effectiveness of this impeachment underscores the absurdity of the position the Government took in its Motion for Reconsideration—where (remember) it insisted that there was *no conflict* between a close-in-time statement that omitted a critical detail and a much later recollection that suddenly included that same detail. *See* Motion for Reconsideration at 1 ("[T]he Coast Guard statement [the Second Law Statement] relied upon to establish statutory jurisdiction was legally sufficient and did not contradict earlier submitted statements which did not address the subject of the defendants' questioning regarding nationality claims for their vessel.").

[17] Officer Pimentel clarified this point, too: "Well," he said, "I wrote my initial statement the day after it happened. . . . The reason it has the date of 26th is because I don't sign it until the 26th, because we're actively doing missions, and I don't always have connectivity or access to a computer." Second Hr'g Tr. at 47:2–3, 5–7.

how long it was, what it looked like[,] . . . [Pimentel's] own actions . . . [a]nd those of [his] fellow officers. . . . [a]nd those of the detainees," *id.* at 43:21–44:2. Pimentel also included in that near-contemporaneous statement "what [he] said to [the Defendants]," including directions "to put their hands up," "to come out from the tarp," and "[t]o keep their hands up." *Id.* at 44:23–45:6.

But notably *absent* from Pimentel's First Statement—the only one written by a Spanish speaker immediately after the interdiction (when the events were freshest in his mind)—were *any* questions about the vessel's nationality. Defense counsel probed this issue, too—asking Pimentel *what* had caused him to revise his statement, months after the fact, to include details he'd omitted from his initial report. And his answers to these questions were quite revealing. Officer Pimentel explained that, in October or November of 2022, a "Lieutenant Karega [ ] requested more information about the case," and Pimentel "answered some questions that she had[.]" *Id.* at 46:14–16; *see also* Lieutenant Karega Email Chain (the "Karega Emails") [ECF No. 78-2] at 21.[18] Here's how he described Lieutenant Karega's request:

> [Defense Counsel]: [S]omeone contacts you and tells you, "We need you to revise your statement," right?
>
> [Pimentel]: So I don't think it's a revision. It's more of clarifying certain information that was not included on the initial statement.
>
> Q: To add new information, information that was not previously included.
>
> A: Yes, that's correct.
>
> Q: Okay. And there were [sic] specific information that you were asked to include, right?
>
> A: Yes.
>
> Q: It wasn't just, "Please go back and read and see if there's anything that's missing." It was specific questions and information you were asked to include.

---

[18] The compilation we're calling "the Karega Emails" is actually a few different PDFs joined together into one document—some of which are paginated separately. We're using the blue pagination from the CM/ECF header.

A: They -- they asked me questions, and they asked me to provide answers to those questions.

48:4–19.[19]

But the truth is that Officer Pimentel incorporated, mostly word for word, the phrases Lieutenant Karega had deployed in her email—and which Lieutenant Karenga, in turn, seems to have picked up from Government counsel. In fact, less than an hour before Lieutenant Karega emailed our officers, Government counsel had emailed Karega, asking her to "[p]lease have Officers Law and Pimentel provide affidavits regarding this interdiction that answer the following questions[.]" Karega Emails at 22. We've mapped out the three emails—the first from the prosecutor,[20] the second from Lieutenant Karega, and the third from Pimentel—to demonstrate just how egregiously Officer Pimentel lifted the contents of his second report from the emails he received from people who *weren't* at the interdiction:

---

[19] *See also* Second Hr'g Tr. at 56:12–17 ("[Defense Counsel]: No, nobody forced you, but a lieutenant asked you to add certain things to your statement because they weren't there, right? A: Yes. She asked questions, but she didn't ask me to add anything. She asked questions and asked for the answers to those questions.").

[20] In quoting the prosecutor's email here, we're not at all suggesting that the prosecutor did anything wrong. We're simply showing the provenance of the words and phrases Officer Pimentel deployed in his revised statement.

| From: Prosecutor<br>To: E'Bria Karega<br>Date: October 11, 2022<br>ECF No. 78-2 at 22 | From: E'Bria Karega<br>To: Yocar Pimentel (et al.)<br>Date: October 11, 2022<br>ECF No. 78-2 at 21 | From: Yocar Pimentel<br>To: E'Bria Karega<br>Date: October 11, 2022<br>ECF No. 78-2 at 21 |
|---|---|---|
| 1. Did they specifically ask who the master was and the vessel's nationality? | 1. Was the language used "who is the master?" and "Would you like to make a claim of nationality for the vessel?" (or "Does this vessel have a nationality?"[)] If no, what were the precise questions asked (to the best of your knowledge[?] Please also state if the questions were asked in another language. | 1. I asked "who is the master" in Spanish . . . . They simply said that nobody was the master, this was repeated by at least 2 of the persons on board. Also, nobody made a claim of nationality for the vessel. The person that I observed driving the vessel said that they were from Dominican Republic. The question was asked "would anyone like to make a claim of nationality for the vessel". Again, this was asked in Spanish[.] |
| 2. Pls also have them both include information regarding whether they asked the defendants these questions as a group or one-by-one. | 2. Were these questions asked individually to each person or as a group? | 2. The question[s] were asked as a group once we pulled alongside and took positive control of the situation, there were 04 POB and I tried to ask everyone to see if anyone would like to identify themselves as the master or make a claim of nationality. |
| 3. Finally, we understandably need to know what specific crew members stated in response to these questions regarding the identity of the vessel's master and the vessel's nationality. | 3. Finally, what were the precise answers from the crew members regarding the vessel's nationality and the vessel master's identity? | 3. The precise answer from them was that no one was the master and then they did not want to elaborate more. |

As this chart shows, Pimentel added the meat of his revised statement at the Government's direct urging, and his most relevant *phrases*—including the crucial questions "who is the master?" and "would you [anyone] like to make a claim of nationality for the vessel?"—came (virtually word for word) from Lieutenant Karega. Indeed, Officer Pimentel didn't disagree that he took these questions directly from Lieutenant Karega's email. *See* Second Hr'g Tr. at 59:2–8 ("[Defense Counsel]: So the lieutenant asked: 'Was the language used "who is the master?"'" And then you added – 'the question

was asked' – I'm sorry, I lost my place. . . . 'I asked everyone as a group, "who is the master?"' A: In Spanish."); *id.* at 59:11–16 ("[Defense Counsel]: And, in fact, the lieutenant then said: 'And would you like to make a claim of nationality for the vessel or does this vessel have a nationality?' And that's the same thing that you wrote. 'The question was asked: "Would anyone like to make a claim of nationality for the vessel?"' A: Yeah, both questions were asked in Spanish, sir."). By the end of this questioning, in fact, Officer Pimentel answered "Yes" when asked whether, "essentially, all of this section in the middle here [in the Second Pimentel Statement], including everything that's directly quoted, were the same direct quotes that you received from the lieutenant." *Id.* at 60:7–10. And that "section in the middle" of the Second Pimentel Statement is, of course, *the only section* that mentions *any* discussion between the boarding team and the Defendants about the vessel's nationality.

Not content to leave things there, defense counsel then walked Pimentel through *everything else* that *might* have "refreshed" Officer Pimentel's memory and got Pimentel to confirm that *none* of those *other* documents could've done the trick. Of the Alpha Report, Officer Pimentel agreed that "[no]thing in this document [ ] caused [him] to refresh [his] recollection and use these direct quotations in [his] new affidavit," *id.* at 72:13–15, because "I saw that document *after* I wrote my statement – my second statement," *id.* at 72:18–19 (emphasis added). Put a pin in the Alpha Report because we'll hear much more about it in a moment.

Officer Pimentel also conceded that "none of the original reports [ ] could have refreshed [his] recollection about those particular statements," *id.* at 73:14–16, because none of them memorialized anyone having asked the Defendants "who is the master" or "would anyone like to make a claim of nationality for the vessel." *Id.* at 73:7–17 ("[Defense Counsel]: Well, right. So these questions, these statements, 'Who is the master' . . . and 'would anyone like to make a claim of nationality,' you'd agree with me that those statements were not included in any of the original reports in this case. A: Yes. Q: All right. So none of the original reports, then, could have refreshed your recollection about those

particular statements, could they? A: That's correct."). Officer Pimentel's memory was "refreshed," in other words, *only* by the things he read in Lieutenant Karega's email—which, again, he promptly copied virtually word for word.

And then came the redirect—in which the Government unwittingly impeached its own witness. Here's how that happened. Officer Pimentel had suggested, in response to questions from the Government, that he didn't really need to write things down in his initial report because "[i]t's included, I believe, in the SITREP, situational report. . . . [and] on the alpha report, I believe it is included." *Id.* at 84:9–10, 18. This, of course, made no sense given Officer Pimentel's earlier testimony that his written "statements are really important," which is why he "tr[ies] to write those statements as soon as [he] possibly can under the circumstances"—because "your memory is freshest closer in time to when the interdiction happened." *Id.* at 40:25–41:7. Anyway, the Government then handed Pimentel a copy of the SITREP (the Situational Report) and asked him to review it for several minutes. The Government evidently believed that, consistent with Pimentel's testimony, the SITREP would *in fact* include some reference to the MDLEA questioning Pimentel had referenced in his Second Statement. Oddly enough, the defense—perhaps also believing that the SITREP might include some mention of the MDLEA questions—objected to its admission (as improper hearsay and for lack of authentication). *Id.* at 89:8–12 ("Mr. Petruzzi: We'd object to hearsay, Your Honor. The Court: Hearsay? Ms. Taylor: And also, Your Honor, he did not generate this report. All he's done is review it. So I'm not really sure that he's a proper witness.").

We overruled the defense's objections and permitted the examination to proceed—which is when this happened:

> [Government Counsel]: Do you see any reference to the nationality of the vessel being reported?
>
> [Pimentel (reviewing the SITREP)]: I don't see any reference to the nationality being reported there.

Q: Okay. Do you see any reference to the questions relating to the master and who that person might have been?

[Defense objection is overruled]

A: I don't see any.

Q: Okay. Referring to the second page, do you see any reference to the questions relating to the master there?

A: No.

Q: And the vessel's nationality, do you see any reference to that?

A: I don't see anything there.

Q: Okay. All right. So that information is *not* in the situation report, is that right?

A: That's correct.

*Id.* at 90:22–91:15 (emphasis added). And, just like that, the prosecutor—having performed what we can only describe as a very effective cross-examination *of her own witness*—concluded her redirect and sat down. The upshot was that, like the boarding officers' initial reports, the SITREP included *no reference* to the MDLEA questioning that, *after* Lieutenant Karega's email, suddenly found its way into Pimentel's Second Statement.

The Government then called Officer Patnaude—whose testimony was, for the simple reason that he speaks *no Spanish*, mostly irrelevant. *See id.* at 131:3–5 ("A: I do not speak Spanish. Q: Or understand Spanish, do you? A: No."). Officer Patnaude testified that he remembered telling Officer Pimentel, in English, what to say to the Defendants and that, after Officer Pimentel did his best (on the high seas) to translate Officer Patnaude's questions into Spanish, Pimentel relayed to Officer Patnaude what the Defendants had said in response. *See id.* at 107:25–108:5 ("[Defense Counsel]: So whatever you said in English was immediately followed by his [Pimentel's] translation in Spanish, correct? A: It could also have been simultaneous. Q: Right. After you said it, he said it in Spanish. You

said it in English, he said it in Spanish, right? A: We could have both been saying it at the same time.").

Here's how Patnaude recalled the questions he directed Pimentel to pose to the Defendants:

> [Government Counsel]: What was the next question you asked?
>
> A: "Who is in charge" or "who's the master?"
>
> Q: Was that question relayed to them in Spanish?
>
> A: Yes.
>
> Q: Do you recall what the answer was?
>
> A: I believe they said no one.
>
> . . .
>
> Q: What was the next question?
>
> A: Asked where they were coming from.
>
> Q: Did they answer that?
>
> A: I don't remember.
>
> . . .
>
> Q: What else?
>
> A: Where they were going to.
>
> Q: Uh-huh. And the answer?
>
> A: I believe they said Haiti.
>
> Q: Did you ask any other questions?
>
> . . .
>
> A: We asked where the boat itself is from.
>
> Q: The answer to that question?
>
> A: We did not receive any answer.

*Id.* at 99:11–100:9.

We can see clearly now the outlines of the vise the Government has walked itself into. On the one side, we have a seasoned officer (Patnaude) who directed the boarding team's translator (Pimentel) to pose certain questions to the Defendants *in Spanish*. But, because Patnaude speaks no Spanish, he doesn't actually know *what* Pimentel said. In Patnaude's words: "I believe there's an understanding between us that – not speaking Spanish myself, that the word[s] [he uses] may be different." *Id.* at 109:2–3. On the other side, we have a rookie officer (Pimentel) out on his first drug-smuggling interdiction,[21] who has already admitted that he *in fact* used *different* words. In his Second Statement, remember, Officer Pimentel wrote that he asked the Defendants: "[A]lguien en el bote desea hacer un reclamo de nacionalidad?" Second Pimentel Statement at 1. This, as we've explained, means: "Does anyone on the boat wish to make a claim of nationality?" And we've already seen that, according to Officer Pimentel, the Defendants *didn't* fail to answer this question; on the contrary, they truthfully answered that "they were Dominican." Second Hr'g Tr. at 29:6. So, even if Officers Pimentel and Patnaude told us the whole truth during their testimony—and even if we accept that, months after the fact, they suddenly remembered these minute details—their testimony, taken together, *doesn't* establish that the Defendants "fail[ed], on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel[.]" 46 U.S.C. § 70502(d)(1)(B). Plus, as we've emphasized, during his testimony, Officer Pimentel phrased his question somewhat differently than he did in his Second Statement. In court, he said that he asked the Defendants "if anyone wants to make a claim of nationality for themselves <u>or</u> for the vessel." Second Hr'g Tr. at 29:2–3. As we've discussed, however, this phraseology comes with its own set of problems and likewise fails to get the Government over the threshold.

---

[21] Pimentel testified that "it was my first interdiction on board this vessel. . . . [I]t was my first possible drug smuggling case[.]" Second Hr'g Tr. at 85:2, 5.

So, what do we make of this discrepancy between what Officer Pimentel wrote in his First and Second Statements? And what about the inconsistency between what Officer Pimentel said he asked the Defendants in his Second Statement and how he phrased that questioning in his testimony? As we see it, there are two (and only two) possible ways of harmonizing all this evidence—*both* bad for the Government. But, before we get into what those two possibilities are, we'll need to finish with our summation of Officer Patnaude's testimony.

Like Officer Pimentel, Patnaude suggested that we didn't really need to guess about the questions the boarding team asked because the Coast Guard kept a contemporaneous record of everything that happened during the interdiction. Specifically, Patnaude testified (on direct) that he was "relaying [the Defendants' answers] on the radio to the *Winslow Griesser* bridge command," *id.* at 100:16–17, where, to his knowledge, "[i]t was put into the alpha report," *id.* at 100:24. And so, out came the Alpha Report again. After giving Officer Patnaude some time to review the Alpha Report, the Government asked him to explain some of its notations: "Specifically with regard to the vessel's nationality," the Government asked, "the alpha report references nationality here at 6, it says 'n/a' for 'not applicable.' Can you explain that notation, please?" *Id.* at 103:7–9. "The 'not applicable,'" Patnaude testified, "would say that there was none available." *Id.* at 103:10–11. "Or," he continued, "it could also have been written as 'none.'" *Id.* at 103:15–16. The Government then asked: "[R]egarding the master's name, date of birth, and nationality, what is written there?" *Id.* at 103:22–23. "UNK," Patnaude said, which means "unknown." *Id.* at 103:24, 104:1.

Before concluding—and for reasons we can't begin to understand—the Government then brought out the SITREP again and asked Officer Patnaude: "[A]nywhere in here does it reflect the questions and answers relating to the master and the nationality of the vessel?" *Id.* at 106:6–8. Unsurprisingly, after taking a few minutes to review the SITREP thoroughly, Patnaude looked up and confirmed what we already knew: "I don't see it," he said. *Id.* at 106:19. After some relatively

uneventful cross, the Government self-destructed *again* on redirect. Handing him the "case package,"
Government counsel asked Patnaude to find the "smooth log" he'd referred to earlier in his testimony.
*See id.* at 102:2–4 ("A: For the timeline, I would have to refer to the law enforcement SITREP or the
smooth log of which personnel were where."). After Patnaude zeroed in on "this page, titled 'log
remarks sheet," *id.* at 123:21, the prosecutor sought to admit the smooth log:

> [Government Counsel]: For identification purposes only, is this the document you're
> referring to, sir?
>
> A: Yes.
>
> Q: Okay. And it refers to the vessel the *Winslow Griesser*, is that right?
>
> A: Yes.
>
> Q: And the day of the week being Friday, December the 24th of 2021?
>
> A: Yes.
>
> Q: It's a two-page document, is that correct?
>
> A: Yes.

*Id.* at 124:8–18. With this foundation laid, we admitted the smooth log over the defense's objections
and waited (again) for the moment we thought was inevitable: *some* proof to support the Government's
position. As before, though, that proof never came. After a few meandering questions about the
timestamps in the boarding chronology—"So at the time, 1612, is that Zulu time? . . . Would it say 'Z'
or does it have to, do you know? . . . Now, we're not seeing a 'Z' here, or do you see one?" *id.* at
124:10–17—Government counsel just abandoned the smooth log and moved on.[22]

Trying to salvage the examination, the Government now abruptly changed course.
Government counsel asked Patnaude whether he's even "*required* to include all of the answers to the

---

[22] While Government counsel was posing irrelevant questions about whether a "Z" in the smooth log
indicates Zulu time, we were reading the smooth log—several times over—and arriving at the same
realization as the Government: It included *no mention* of the MDLEA questions.

questions regarding the master and the nationality in [his] statement." *Id.* at 127:12–14 (emphasis added). "No," he replied. *Id.* at 127:15. But this last-ditch effort to move the goalposts fooled no one: Realizing that (contra the officers' testimony) *none* of the contemporaneous documents referenced the MDLEA questions at all, the Government was now trying to suggest that the officers weren't *required* to notate everything that happened anyway. Here (again) the government missed the point. The question isn't whether the Government was under some legal obligation to write things down. The question (rather) is whether, when a witness elects to write a bunch of things down, but then leaves one very important thing out, we should simply ignore the fact that the important detail was omitted. We won't do that—principally because even the Government believes that near-contemporaneous report writing is important. *See id.* at 83:11–14 ("[Government Counsel]: You testified, sir, that it is important that details be documented that are accurate – that are as accurate and complete as possible in the reports, is that right? [Officer Pimentel]: Yes.").

And, indeed, towards the end of Patnaude's redirect, the Government showed its hand: by suggesting *not* that close-in-time reports are unnecessary (or unimportant), *but* that a detail needn't be included there if it can be found in *other* contemporaneous records. Why is it, Government counsel asked Patnaude before sitting down, "that [he] might have omitted information [from his statement] about the master and nationality in the questions[?]" *Id.* at 128:3–5. His answer brought down the fragile foundation on which the Government's shifting position was precariously standing: "They may be omitted from my personal statement," he said, "as they're in the alpha report, in the – possibly in the ship's smooth log, and also that the statement of no objection may not be approved without them[.]" *Id.* at 128:6–9. As we've seen, however, those MDLEA questions appear *nowhere* in the Alpha Report, the smooth log, or the SITREP (or, for that matter, *in any other* contemporaneous document).

## IV.    Analysis

So, what really happened that Christmas Eve on the high seas? As we've suggested, we think the evidence supports one of two theories, both of which require dismissal: *Either* Officer Pimentel didn't ask the relevant MDLEA questions *or*, if he did, he used the wrong words—such that the Defendants cannot be said to have "failed" to answer him. Let's review the evidence the parties have adduced for each possibility.

The first scenario seems to be the one the Defendants prefer. *See* MTD at 16 ("Because the government has failed to establish that the Coast Guard asked the necessary questions to identify the master *or* individual in charge, or to establish whether said individual wished to make a claim of nationality *or* registry, it has failed to demonstrate statutory jurisdiction and the indictment must be dismissed."). And there's plenty of evidence to support this view. *One*, Officers Pimentel and Law *each* wrote statements *immediately after* the interdiction, in which they mentioned all kinds of important details—including the date, time, and geographical coordinates of the interdiction; the evening's weather and wind conditions; descriptions of the boat's occupants and its cargo; and (notably) a step-by-step synopsis of the interactions between the boarding team and the Defendants. *See generally* First Law Statement; First Pimentel Statement. But *nowhere* did these near-contemporaneous statements so much as hint at the crucial questions that would have authorized our officers to board the vessel and arrest the Defendants. *See*, *e.g.*, Second Hr'g Tr. at 63:12–23 ("[Defense Counsel]: Okay. So why is it that this material about the R[ight] O[f] V[isit], if it's so common, why isn't it that it was included when you did your initial affidavit? [Pimentel]: Well, maybe because we are in a – it's a very busy area. We stay pretty busy, sometimes working 20, 22-hour days. Make mistakes, sometimes we maybe forgot to add it at the initial time when it happened. . . . So sometimes it happens that we stay so busy and mistakes get made or we forget to add something at the moment when it happened."); *id.* at 64:18– 65:2 ("[Defense Counsel]: And so how come, if you know, wasn't any of these – wasn't any of this

information, who's the master, what's the nationality, all of these direct quotes, why weren't they included by Patnaude or Law or anybody else in their contemporaneous statements? [Pimentel]: A reason could be that they do not – they're not fluent in Spanish, so they didn't directly ask the questions. I can't speak for them. I didn't write their statements. But maybe that's why. They don't speak Spanish, so they maybe didn't feel the need to add it or – I have no clue."). And (contra the Government's view at the second evidentiary hearing) these reports—and the information they contain—matter a great deal. As Officer Pimentel confirmed during his testimony, the written "statements are really important," which is why he "tr[ies] to write those statements as soon as [he] possibly can under the circumstances"—because "your memory is freshest closer in time to when the interdiction happened."[23] *Id.* at 40:25–41:7; *see also id.* at 70:19–21 (Pimentel agreeing with defense counsel that "the reason that reports are written close in time to events happening is because those things are fresher in your memory when they happen").

    *Two*, some *ten months* later (*after* the Defendants had identified the critical omission in their MTD, *after* the Court had dismissed the Indictment the first time around, and *on the eve* of the Government's deadline to submit renewed affidavits), Pimentel supplemented his statement to add the MDLEA questions he'd conveniently received just two days earlier from a higher-ranking officer (Lieutenant Karega)—questions he then copied, sometimes *word for word*, into his second report.[24] *See* Second Pimentel Statement at 1; *see also* Second Hr'g Tr. at 56:18–24 ("[Defense Counsel]: Well, why did you use the same exact quotations that she used? Word for word. [Pimentel]: Because I was just answering the questions that they wanted me to *add* into the – into that statement, to the new statement." (emphasis added)).[25] And these questions didn't just come to Lieutenant Karega—or (it

---

[23] This was, in fairness, a question from defense counsel to which Pimentel assented.

[24] *Q.v.* the chart we prepared on page 25.

[25] We highlight Officer Pimentel's use of the word "add" in this answer because it directly contradicts something he said earlier in his testimony. *See* Second Hr'g Tr. at 56:12–17 ("[Defense Counsel]: No,

goes without saying) to Officer Pimentel—*ex nihilo*. These questions were very much suggested (as we've seen) to Lieutenant Karega in an email the *prosecutor* had sent just a few hours earlier. When Officer Pimentel prepared his Second Statement, in other words, he had the benefit of *both* the prosecutor's email *and* Lieutenant Karega's proposed questions—the same questions he then conspicuously copied (sometimes verbatim) into his revised report.

*Three*, both Officer Pimentel and Officer Patnaude insisted that the MDLEA questions—had they been asked—*would've* been included in *some* contemporaneous Coast Guard record: the Alpha Report, the SITREP, or the smooth log. *See id.* at 84:6–18 ("[Government Counsel]: Where is that information about the master, who the master is, and the nationality of the vessel – where is that included? [Pimentel]: It's included, I believe, in the SITREP, situational report. . . . Q: Where else is it included, sir? A: On the alpha report, I believe it is included."); *id.* at 100:10–24 ("[Government Counsel]: Now, when you're receiving these answers or responses one way or another were you memorializing the answers that you were receiving? Personally? . . . Were you memorializing or taking down the answers that [the Defendants] provided to you? [Patnaude]: I was relaying them on the radio to the *Winslow Griesser* bridge command. . . . Q: Do you know what was done with that information? A: It was put into the alpha report."); *id.* at 128:3–9 ("[Government Counsel]: And tell the judge why it is that you might have omitted information [from your statement] about the master and nationality in the questions being asked? [Patnaude]: They may be omitted from my personal statement as they're in the alpha report, in the – possibly in the ship's smooth log, and also that the statement of no objection may not be approved without them."). But, as we've underscored, *none* of these contemporaneous documents suggested—let alone proved—that the boarding team asked our

---

nobody forced you, but a lieutenant asked you to *add* certain things to your statement because they weren't there, right? A: Yes. She asked questions, *but she didn't ask me to add anything.* She asked questions and asked for the answers to those questions." (emphasis added)). Needless to say, these two aspects of Pimentel's testimony cannot both be true.

Defendants the MDLEA questions. *See id.* at 72:9–12 ("[Defense Counsel]: And you'd agree with me nowhere on here [the Alpha Report] does it state that there are any questions in particular that were asked? [Pimentel]: Yes."); *id.* at 73:7–13 ("[Defense counsel]: So these questions, these statements, 'Who is the master,' . . . and 'would anyone like to make a claim of nationality,' you'd agree with me that those statements were not included in any of the original reports in this case. [Pimentel]: Yes."); *id.* at 103:7–18 ("[Government Counsel]: Specifically with regard to the vessel's nationality, the alpha report references nationality here at 6, it says 'n/a' for 'not applicable.' Can you explain that notation, please? [Patnaude]: The 'not applicable' would say that there was none available. . . . That would be 'none available,' or it could also have been written as 'none.' . . . Q: [R]egarding the master's name, date of birth, and nationality, what is written there? A: 'UNK.' . . . Unknown.").[26]

        We'll highlight what happened with the SITREP separately because it was so representative of the Government's efforts in this case. Everyone in the courtroom, remember, believed that the SITREP, appearing as it did for the first time during Pimentel's redirect, would put this whole MDLEA issue to bed. Officer Pimentel was, after all, clear that "[the] information about the master, who the master is, and the nationality of the vessel" was "included, I believe, in the SITREP, situational report." *Id.* at 84:6–10. Hearing this—and watching the prosecutor produce the SITREP from a stack of documents in open court—the defense lawyers launched a barrage of kitchen-sink objections (hearsay, authenticity), all in a last-ditch effort to keep the (seemingly damaging) document out. We overruled those objections and allowed the witness to examine the SITREP. The courtroom grew quiet. The prosecutor, the witness, the defense lawyers, and the Court all began reading the report in

---

[26] As this quotation makes clear, Officer Patnaude testified that "n/a" means "none available." Second Hr'g Tr. at 103:15–16. And that's exactly right: It wasn't available because no one asked for it. He then separately suggested that "[n/a] could also have been written as 'none.'" *Ibid.* But, of course, it wasn't. And we won't change the words the Alpha Report *actually* uses to make the document conform, without credible proof, to the Government's view.

silence. We read it a second time, a third time—nothing: not a single mention *anywhere* in the SITREP of the crucial questions that would've authorized our jurisdiction over these Defendants. And then the moment that let all the air out of the room:

> [Government Counsel]: Okay. Do you see any reference to the questions relating to the master and who that person might have been?
>
> [defense objection is overruled]
>
> [Pimentel]: I don't see any.
>
> Q: Okay. Referring to the second page, do you see any reference to the questions relating to the master there?
>
> A: No.
>
> Q: And the vessel's nationality, do you see any reference to that?
>
> A: I don't see anything there.
>
> Q: Okay. All right. So that information is not in the situation report, is that right?
>
> A: That's correct.

*Id.* at 91:1–15. Having thus proved nothing, Government counsel ended her redirect and sat down.

But somehow that wasn't the end of it: Recall that this whole devastating scene repeated itself with Officer Patnaude on the stand. He was *also* shown the SITREP, and—after reviewing it several times in search of "the questions and answers relating to the master and the nationality of the vessel," *id.* at 106:6–8—he *likewise* admitted: "I don't see it," *id.* at 106:19. Officer Patnaude then suggested that the MDLEA questions might be "in the alpha report, in the – possibly in the ship's smooth log[.]" *Id.* at 128:7–8. As we've highlighted, however, when the prosecutor showed Patnaude the Alpha Report (and later the smooth log)—he was forced to concede that, like the SITREP, those documents included *no reference* to the crucial jurisdictional questions. *See id.* at 103:7–104:1 (Patnaude testifying *only* that the Alpha Report "references nationality here at 6, it says 'n/a' for 'not applicable,'" which "would say that there was none available. . . . or it could also have been written as 'none,'" and adding

that "regarding the master's name, date of birth, and nationality," the Alpha Report says "UNK," which stands for "unknown"); *see also id.* at 123:7–127:10 (Patnaude finding *no* relevant jurisdictional questions or answers in the smooth log).

There is, in short, plenty of support for the Defendants' view that the contemporaneous record includes *no mention* of the MDLEA questions *precisely* because Officer Pimentel *never* asked those questions.

The second scenario, though, likewise has evidence to commend it. Here, remember, the answer is *not* that Officer Pimentel asked *no* MDLEA questions, *but* rather that he phrased those questions confusingly—such that the Defendants cannot be blamed for having "failed" to answer him. Here's the evidence (as we see it) for this second view.

*One*, in his Second Statement, Pimentel said that, after he and the other Coast Guard officers pulled up alongside the Defendants' vessel, he asked them in Spanish: "Alguien en el bote desea hacer un reclamo de nacionalidad[?]" Second Pimentel Statement at 1. As we've explained, however, this question didn't require the Defendants to say anything about *the vessel's* registry. It simply asked whether "*anyone* on the boat wish[es] to make a claim of nationality." So, when "[t]he person that [Pimentel] observed operating the vessel said that they were originally from Dominican Republic," *ibid.*, that Defendant didn't *fail* to answer Pimentel's question at all. On the contrary, that Defendant answered the question directly and (so far as we can tell) truthfully. The Defendants are, as far as we understand, Dominican.

*Two*, during his live testimony, Pimentel said that he asked a different question—*viz.*, whether the Defendants would like to "make a claim of nationality for themselves <u>or</u> for the vessel." Second Hr'g Tr. at 29:1–3 ("[Government Counsel]: What was the next question that you asked? [Pimentel]: If anyone wants to make a claim of nationality for themselves <u>or</u> for the vessel."). Again, Officer Pimentel says, one of the Defendants answered *this* question by claiming "that they were

Dominican[.]" Second Hr'g Tr. at 29:6. For all the reasons we explained on pages 20–21, *supra*, this was an accurate and appropriate answer to Pimentel's compound (and disjunctive) question.

*Three*, Officer Patnaude testified that he directed Pimentel to ask the proper questions— including "[w]ho is in charge or who's the master," *id.* at 99:12, and "where the boat itself is from," *id.* at 100:7. To the former question (Patnaude said) the answer was "no one," *id.* at 99:16; to the latter, Patnaude explained, Pimentel "did not receive any answer," *id.* at 100:9. But, as we've established, Patnaude doesn't *know* what Pimentel asked—or how the Defendants responded—because he doesn't speak *any* Spanish. *See id.* at 131:3–5 ("[Patnaude]: I do not speak Spanish. [Defense Counsel]: Or understand Spanish, do you? A: No."). The point here, of course, is that Patnaude may well have been directing Pimentel to say certain things to our Defendants—and he may have even heard Pimentel asking the Defendants some questions in Spanish. But he doesn't know whether Pimentel posed the *same* questions he ordered Pimentel to ask. And, in fact, we know from Pimentel's testimony that, if Pimentel did ask any questions, he used *different* words than the ones Patnaude had instructed him to use—a possibility Patnaude accepted during his testimony. *See id.* at 109:2–3 ("I believe there's an understanding between us that – not speaking Spanish myself, that the word[s] [he uses] may be different."). As this analysis has shown, we're not suggesting that Officer Patenaude testified untruthfully. We're simply noting that, even if we accept *everything* Officer Patnaude said, the Government still failed to meet its burden.

We might justifiably wonder, though, how it is that Officer Pimentel dropped the ball here. He, after all, *either* asked the wrong questions *or* he asked no relevant questions at all. We won't venture a guess as to which of these alternatives best approximates what *really* happened because it's sufficient for our purposes to say that *neither* supports the Government's position. Still, we think it appropriate to note that Officer Pimentel's recollections—so many months after the fact—*could* have been tainted by the unique circumstances of our Defendants' interdiction. This was, after all, Pimentel's very first

drug-smuggling run. *Id.* at 85:2, 5 ("[Pimentel]: [I]t was my first interdiction on board this vessel. . . . [I]t was my first possible drug smuggling case[.]"). Plus, to use his words, "[w]e are in a – it's a very busy area. We stay pretty busy, sometimes working 20, 22-hour days. Make mistakes, sometimes we maybe forget to add it at the initial time when it happened." *Id.* at 63:15–18. And, indeed, mistakes were much more likely in our case because, as Pimentel admitted, "[w]e actually had a case the day after this happened, so that's why this got signed on the 26th, because I actually had – was working the whole day on the 25th. So sometimes it happens that we stay so busy and mistakes get made or we forgot to add something at the moment when it happened." *Id.* at 63:18–23.

All of which suggests that much of Pimentel's misremembrances can be attributed to a combination of inexperience (his first interdiction), fatigue (the long days over the Christmas holiday), and the unusual proximity between *this* interdiction and the one that followed it the next day. Did Officer Pimentel simply forget to ask our Defendants the MDLEA questions? Or did he, in the direct aftermath of his first high-speed chase, and on choppy evening seas, just ask the questions in a materially confusing way? We'll never know—and needn't speculate. What we *can* say is that, either way, the Government has failed to establish our subject-matter jurisdiction under the MDLEA.

The Eleventh Circuit has said that the phrase "on board a vessel subject to the jurisdiction of the United States" manifests a "congressionally imposed limit on courts' subject matter jurisdiction, akin to the amount-in-controversy requirement contained in 28 U.S.C. § 1332." *De La Garza*, 516 F.3d at 1271. And whether a vessel is subject to the jurisdiction of the United States is "solely an issue of subject matter jurisdiction that should be treated as *a preliminary question of law* for the court's determination." *Tinoco*, 304 F.3d at 1105 (emphasis added). Since the Government hasn't proven that the Defendants' vessel was subject to the jurisdiction of the United States, "the MDLEA provides courts no jurisdiction over prosecutions under its terms." *Guerro*, 789 F. App'x at 744.

*     *     *

For all these reasons, then, we **GRANT** the Defendants' MTD.

## V.    The Motion to Stay

In its Motion for Reconsideration, the Government also asked us to stay the Defendants'
release pending the Government's possible appeal of our decision. *See* Motion for Reconsideration at
6. While we're inclined to deny this request, we'll grant a limited stay of **30 days** to give the
Government a chance to seek (and obtain) a further stay pending appeal from the Eleventh Circuit.

As the Government acknowledges, in deciding whether to grant a stay pending appeal, the
Supreme Court has outlined a four-factor test:

> (1) Whether the stay applicant has made a strong showing that he is likely to succeed
> on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)
> whether issuance of the stay will substantially injure the other parties interested in the
> proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009). Most of these factors weigh against the Government here.

*First*, for all the reasons we've outlined in this Order, we don't think the Government came
close to meeting its burden—so we find unpersuasive its conclusory claim that it's likely to succeed
on the merits. *See* Motion for Reconsideration at 6–7 ("The United States has a strong likelihood of
success on the merits.").

*Second*, the Government fully ignores the "irreparable injury" factor—this despite
acknowledging that "[t]he first two [factors] are the most critical." *Id.* at 6 (quoting *Nken*, 556 U.S. at
434). The Government has thus forfeited any argument it could've advanced as to this second factor.
*See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an
initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by
the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739
F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either
makes only passing references to it or raises it in a perfunctory manner without supporting arguments
and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he

failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

*Third*, the Defendants *are* likely to suffer substantial injury if we stay their release. Their continued detention (in a nation not their own) is an obvious affront to their liberty—particularly given our decision to dismiss all remaining charges against them.

*Fourth*, the public interest is a draw. While the public (and the Government) have an obvious interest in prosecuting those who would deal in dangerous drugs (particularly in these quantities), ours is a system of laws—and the public has an equally compelling interest in holding the Government to its burden in criminal cases.

Because three of the four stay factors—including the "most critical" first two—weigh strongly against the Government, we're inclined to deny the Government's request for a stay. At the same time, we recognize that our analysis of the stay factors could be second-guessed—and that, if we are wrong in denying a stay (and if the Defendants are then released back to their home countries), the Eleventh Circuit won't have a chance to intercede. So, we'll **STAY** the Defendants' release for **30 days** to give the Government one opportunity to seek (and obtain) a stay pending appeal from the Eleventh Circuit. If the Eleventh Circuit doesn't issue a further stay of our Order within **30 days**, the U.S. Marshal and the Bureau of Prisons are directed to release the Defendants or, as appropriate, to turn them over to the immigration authorities for removal.

## CONCLUSION

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendants' MTD [ECF No. 27] is **GRANTED**.[27]

---

[27] We initially granted the MTD at the end of the first evidentiary hearing. *See* MTD Hr'g Tr. at 159:9–10 ("[The Court]: It was the government's burden to prove jurisdiction. They failed to do so, and so I grant the motion."). And we confirmed that ruling in a written order the following day. *See generally* Order Dismissing the Indictment. We then granted the Government's request that we reconsider our

2. The Indictment [ECF No. 1] is **DISMISSED**.

3. The Government's request for a stay of the Defendants' release pending appeal, *see* Motion for Reconsideration [ECF No. 52] at 6–7, is **GRANTED in part** and **DENIED in part** as set forth in this Order.

4. This case shall remain **CLOSED**. All deadlines are **TERMINATED**, and any other pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in the Southern District of Florida on May 17, 2023.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:  all counsel of record
U.S. Probation Office
U.S. Marshal Service

---

decision—but only for the purpose of allowing the Government, at a second evidentiary hearing, to persuade us that we were wrong. *See* Paperless Order Granting Reconsideration and Setting Hearing. Having now completed our review of *all* the evidence—including the evidence the Government presented at that second evidentiary hearing—we **REAFFIRM** our initial decision, **GRANT** the MTD, and **DISMISS** the Indictment.